IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **TRICIA BENTLEY,** | § | |
| | § | |
| Plaintiff | § | **CIVIL ACTION NO. 4:19-cv-4235** |
| | § | |
| Vs. | § | |
| | § | |
| | § | |
| **HARRIS COUNTY INSTITUTE OF SCIENCES,** | § | |
| | § | |
| | § | |
| Defendant | § | **(JURY TRIAL DEMANDED)** |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff Tricia Bentley, (hereinafter, Plaintiff or "Ms. Bentley") filing this Original Complaint complaining of Defendant Harris County Institute of Forensic Sciences (hereinafter, "Defendant" or "HCIFS") and in support thereof provides the following:

### I.    JURISDICTION, PARTIES AND VENUE

1.    This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 12101-12117, Title I of the Americans with Disabilities Act, as amended ("ADAAA"), and the anti-retaliation regulations set forth by ADAAA.

2.    Plaintiff Tricia Bentley resides in Brazoria County, Pearland, Texas. At all times relevant to the facts stated herein, Ms. Bentley was an employee of the Defendant within the meaning of the ADAAA under which she sues.

3.    Plaintiff will serve Defendant with her Complaint by and through its registered agent and/or counsel of record.

4. Defendant resides within the Southern District of Texas, Houston Division. Venue is appropriate in this Court.

5. Whenever in this pleading it is alleged that Defendant did any act or thing, or failed to do any act or thing, it is meant that Defendant's officers, owners, servants, employees, or representatives and management including, but not limited to, Mary Daniels and/or Victoria Jimenez did such act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment at HCIFS or in the furtherance of Defendant HCIFS' interests, or with the full authorization, permission, tolerance, and/or ratification of Defendant, or was done by an authorized member of management of Defendant or was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant's officers, owners, servants, employees, management and/or representatives.

## II.  EXHAUSTION OF ADMINSTRATITIVE REMEDIES

6. Ms. Bentley filed an original Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission (hereinafter "EEOC") on or about February 4, 2019 wherein she averred that Defendant engaged in disability discrimination against her and retaliated against her because of her disability (Chiari Malformation and Basilar Invagination) and requests for reasonable accommodations. The EEOC assigned Ms. Bentley's Charge the No. 460-2019-02042.

7. After investigation of Ms. Bentley's charge, the EEOC issued her a Right-to-Sue letter on or about September 9. 2019. Ms. Bentley timely filed suit in federal court within 90 days of her receipt of her Right-to-Sue letter.

### III. FACTUAL BACKGROUND

8. In February 2010, Ms. Bentley began working for Harris County as a Public Outreach Manager at the Harris County Flood Control District. Then in May 2012, began working as the Public Information Officer (PIO)/Public Outreach Manager for the Defendant. The responsibilities of her job entailed handling and/or coordinating media relations and internal communications.

9. In December 2012, Ms. Bentley was diagnosed with a skull abnormality called Chiari malformation (a structural defect of the base of the skull present at birth that>effects balance and puts pressure on the brain stem) that has caused her to suffer acute headaches, neck pain, changes in her vision and issues with her balance/vertigo. She also had a history of congenital scoliosis; spinal stenosis; Mayer-Rokitansky-Küster-Hauser (MRKH) syndrome, which has outwardly manifested in Ms. Bentley having only one ear; and hip impingement and dysplasia.

10. Due to Ms. Bentley's medical conditions and disability, she has undergone multiple spine and brain stem surgical procedures. Most recently, while on FMLA leave from the Defendant in March 2013, she received a cranial decompression (a surgery that relieves the abnormal compression of a cranial nerve) in order to help alleviate her symptoms and manage the Chiari condition.

11. Unfortunately, as a result of her cranial decompression, in about 2017, her neurosurgeon diagnosed her with a rare and potentially fatal condition called basilar invagination, which causes her skull to settle downward onto the vertebrae of her neck blocking the flow of cerebral spinal fluid around her brain and spinal cord.

12. Ms. Bentley's conditions have caused her to experience severe neurological symptoms such as head pain, neck pain and weakness, nausea, dizziness/vertigo, and arm and leg

weakness and loss of feeling. The symptoms of her medical conditions substantially affect her ability to stand, walk, speak, lift, sleep, eat and work.

13. On or about September 11, 2018, Ms. Bentley began FMLA leave to pursue rehabilitation treatment and disease management for her Chiari malformation and basilar invagination (disabilities) and their resulting symptoms. During that time, she underwent continuous medical evaluations by multiple specialists and surgeons.

14. As the exhaustion of her FMLA drew near, she expressed to her manager, Mary Daniels, on November 2, 2018, that because the symptoms she was enduring were so severe and because her physician was still evaluating her, she would be unable to return to work at the anticipated end of her FMLA leave time.

15. In response, HCIFS told Ms. Bentley—without conferring with Ms. Bentley, a doctor chosen by HCIFS or Ms. Bentley's doctor—that she had four weeks to return to work or she would be terminated.

16. In the beginning of those four weeks, Ms. Bentley was informed by her physician of the possibility of her needing another brain stem surgery before she could return to work. As soon as she learned this information, Ms. Bentley informed HCIFS. She also provided HCIFS with a doctor's note proposing that she return to work without modifications on January 15, 2019; only 45 days more than HCIFS had proposed.

17. On November 30, 2018, however, HCIFS told Ms. Bentley that it would not hold her position open with only a *proposed* or intended date to return to work. HCIFS also told Ms. Bentley that without her presence at work, HCIFS would have to pull staffing resources from other departments to remain compliant with the Public Information Act (PIA) requests.

18. After Ms. Bentley requested that the Defendant reconsider her request to return at a later date, HCIFS concluded that they would not hold Ms. Bentley's position open and that she should propose a more reasonable accommodation request by December 7, 2018.

19. On December 7, Ms. Bentley asked that HCIFS consider the following reasonable accommodations, including the following

- Allow her to work from home for 36 days beginning December 10;
- Consider her for two vacant, more junior-level positions that she was qualified to fill (Pathology Administrative Coordinator and Administrative Assistant), which were listed as open and hiring on the Defendant's job listing service and allow her to start on January 15, 2019; or
- Reconsider her request for leave until January 15, 2019, in consideration of the new information she provided them concerning a sum-certain return to work date and more (as described below).

20. In the December 7th letter, Ms. Bentley (through counsel) reminded HCIFS that she was able to work from home during Hurricane Harvey in her PIO position without issue. In fact, it had been feasible for her to respond to media calls, PIA requests, interview requests, prepare press releases and update the Defendant's website all from home.

21. Considering the feasibility of Ms. Bentley's ability to work from home, Ms. Bentley also asked HCIFS to reconsider her extended leave request with Defendant's "Continuity of Operations Plan" (COOP) in mind.

22. Earlier that same year (2018), Ms. Bentley had been tasked with developing the communications/public outreach component of the Defendant's COOP and setting forth specific directions for maintaining Defendant's operations at full capacity during her absence or in the

midst of a disaster or emergency situation. In fact, Ms. Bentley and her supervisor, Mary Daniels, had previously and openly discussed the necessity of such a plan for Ms. Bentley to be able to maintain her job as PIO based in large part because of her disability/medical condition and sometimes unpredictable absences.

23. Ms. Bentley had also previously prepared Standard Operating Procedures that authorized other staff to respond to requests, and developed a through a media response tip sheet, both of which were approved by Mary Daniel's and the executive director for the Defendant. Ms. Bentley provided training, at the request of Ms. Daniel's and the executive director, in about 2016 to all employees who would have deputy PIO(s) responsibilities and the interim duties that would be assigned to them in Ms. Bentley's absence.

24. In about 2017 at the request of Ms. Daniel's and the executive director, Ms. Bentley also trained about 30 c-level staff and other managers/supervisors to be called upon to conduct media interviews during her unpredictable times of leave. The training was mandatory and had a 100% attendance with the exception of Luis A. Sanchez, Executive Director for the Defendant.

25. With Ms. Bentley's December 7th letter and requests, HCIFS was also specifically informed that Ms. Bentley's doctor had *confirmed* that she would be able to return to work by January 15, 2019, absent any unforeseen complications.

26. Despite this information and the requests within Ms. Bentley's December letter, HCIFS refused to engage in a good faith dialogue about Ms. Bentley's accommodation requests, refused to consider the information or new accommodation requests set forth in the December 7th letter and terminated Ms. Bentley's employment on December 12, 2018.

27. HCIFS never considered Ms. Bentley for the two vacancies for which Ms. Bentley was qualified; HCIFS never considered allowing Ms. Bentley to work for home for 36 more days

in light of her doctor's confirmation that she could return to work by January 15, 2019. Defendant HCIFS did not consider allowing Ms. Bentley to exercise leave under its own Extended Leave of Absence policy. Indeed, Defendant HCIFS simply refused to consider any reasonable accommodation that was available that would allow Ms. Bentley to maintain her job, her healthcare benefits and years of service despite her disability.

28. Within hours after receiving HCIFS' letter of termination, Ms. Bentley's doctor (who had been away from his office for a couple days between HCIFS' request for alternative accommodation requests and Defendant's termination decision), provided Ms. Bentley with written documentation wherein he reconfirmed that Ms. Bentley would be able to return to work by January 15, 2019, absent any unforeseen complications. Ms. Bentley provided her doctor's letter to Defendant HCIFS and requested that Defendant HCIFS consider it, but Defendant HCIFS also ignored Ms. Bentley's doctor's submission although Defendant could have made a reasonable accommodation for Ms. Bentley and considered it.

29. After her termination, Ms. Bentley continued to treat and visit with her physician and became increasingly better. Ultimately, her doctor decided that surgery was unnecessary.

30. On January 11, 2019, Ms. Bentley visited with her physician, and as scheduled and predicted, he released her to return to work with no modifications beginning January 15, 2019.

31. Since Ms. Bentley's release, she has diligently sought to replace her employment by actively applying to other jobs. She has been able to work various fulltime but temporary positions as she continues her search. Her wages have suffered.

32. Ms. Bentley brings this lawsuit against Defendant for Defendant's discrimination against her in violation of the Americans with Disabilities Act, as amended by terminating her employment based on her actual disabilities (congenital scoliosis, Chiari malformation, hip

impingement and dysplasia, MRKH syndrome and basilar invagination), her record of disabilities and/or because of its perception that she is disabled.

33. Additionally, Ms. Bentley brings this lawsuit against Defendant for Defendant's violation of the Americans with Disabilities Act, as amended by failing to consider or provide her with reasonable accommodations that would allow her to maintain and perform her job.

34. Additionally, Ms. Bentley brings this lawsuit against Defendant because Defendant retaliated against her by terminating her employment because of her requests for accommodation based on her disabilities in violation of Americans with Disabilities Act, as amended.

35. Ms. Bentley firmly believes and submits she could have performed her job, and the essential functions of her job, and would have continued her longstanding employment with Defendant if the Defendant would have considered and complied with her reasonable accommodation requests as set forth herein.

36. Ms. Bentley is a qualified individual with a disability under the provisions of the ADA and files suit thereunder herein.

## IV.   CAUSES OF ACTION

### A.   DISCRIMINATION IN VIOLATION OF TITLE ONE OF THE ADAAA

37. Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs above and incorporates them here as though fully set forth.

38. Defendant, through its agents, supervisors, or employees, violated Plaintiffs civil rights in violation of the ADAAA by intentionally interfering with Plaintiff's employment because of her actual medical condition (disability), history and record of disability, and perceived disability by refusing to reasonably accommodate her, refusing to engage in an interactive dialogue concerning her limitations, ability to work and requests, and by terminating her employment.

39. Defendant's discrimination, through its agents, supervisors, or employees, led to the loss and impairment in whole or part, of the wages, benefits, promotions, privileges, years of service, and terms and conditions of Plaintiff's employment.

40. The above-described acts on Defendant's part Defendant's acts were malicious, reckless, and intentional and consisted of discrimination of a continuous nature.

41. As a direct and proximate result of Defendant's willful, knowing and intentional discrimination against her, Plaintiff has suffered and will continue to extreme and severe mental anguish and emotional distress and financial loss. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

B. **RETALIATION IN VIOLATION OF THE ADAAA**

42. Further, Defendant though its, agents, servants and employees, retaliated against the Plaintiff because the Plaintiff in good faith requested reasonable accommodations and that Defendant engage in the interactive process as required by law. As a result of this, Defendant retaliated against Plaintiff by refusing to consider reasonable accommodations presented by Plaintiff in good faith and terminating Plaintiff's employment.

43. As a direct and proximate result of Defendant's willful, knowing and intentional retaliation against her, Plaintiff has suffered and will continue to suffer loss of wages, pain and suffering, and extreme and severe mental anguish and emotional distress, and attorney fees.

44. The above-described acts of Defendant proximately caused Plaintiff substantial injuries and damages.

V. **DAMAGES**

45. Because of Defendant's discriminatory and retaliatory conduct, Plaintiff has suffered, suffers, and will continue to suffer economic losses including past and future lost wages and benefits

as well as humiliation, mental anxiety and stress, and other damages.  Accordingly, Plaintiff seeks all general, special, incidental, and consequential damages all of which amounts to be proved at trial.

46.     Additionally, because of Defendant's unlawful discriminatory and retaliatory conduct, it has been necessary for Plaintiff to retain the undersigned attorneys to represent her in the causes of actions set forth herein.  Further, Plaintiff has agreed to pay her attorney reasonable attorney's fees for the preparation and trial of these causes.

47.     As a further consequence of Defendant's unlawful discriminatory and retaliatory conduct, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living.  Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

48.     Plaintiff also seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant.  Plaintiff also seeks post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against it and to avoid unjustly enriching Defendant.

## VI.   JURY DEMAND

49.     Plaintiff requests that this action be heard before a jury.

## VII.   PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

a.   Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any employment practice which discriminates on the basis of disability.

b.  All damages to which Plaintiff may be entitled pursuant to this Complaint, or any other amendment(s) thereto, including but not limited to back pay, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

c.  Compensatory damages for pain and mental suffering in the past and future;

d.  Reasonable attorney fees with conditional awards in the event of appeal;

e.  Pre-judgment interest at the highest rate permitted by law;

f.  Post-judgment interest from the judgment until paid at the highest rate permitted by law;

g.  Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

h.  Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Complaint or by any amendment hereto.

Respectfully submitted,

/s/ *Marjorie A. Murphy*
Marjorie A. Murphy
Federal Bar No. 34512
The Murphy Law Practice, PLLC
3355 W. Alabama, Ste. 670
Houston, Texas 77098
Telephone: (832) 564-3804
Facsimile: (832) 553-7441
Email: marjorie@themurphylawpractice.com
**ATTORNEY-IN-CHARGE FOR PLAINTIFF,**
Tricia Bentley

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October 2019 this instrument was filed pursuant to the electronic filing protocols applicable in the United States District Court for the Southern District of Texas, Houston Division and that service will be further made in compliance with said protocols to:

/s/ *Marjorie A. Murphy*
Marjorie A. Murphy